### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JASON SLIMM, BRANDI N. SLIMM, AND ROBERT H. OBRINGER, | : | Civil No. 12-5846 (NLH/JS) |
| Plaintiffs, | : | **OPINION** |
| v. | : | |
| BANK OF AMERICA CORPORATION, *et al.,* | : | |
| Defendants. | : | |

**APPEARANCES:**
JASON D. SLIMM
BRANDI D. SLIMM
33 SOUTH BELL ROAD
BELLMAWR, NEW JERSEY
        *Pro Se Plaintiffs,*

ROBERT H. OBRINGER
244 S. BARRETT AVENUE
AUDOBON, NEW JERSEY 08106
        *Pro Se Plaintiff,*

AARON M. BENDER, ESQUIRE
TIMOTHY P. OFAK, ESQUIRE
REED SMITH, LLP
PRINCETON FORRESTAL VILLAGE
136 MAIN STREET, SUITE 250
PRINCETON, NEW JERSEY 08540
        *Attorneys for Defendants Bank of America Corporation, Bank of America, N.A., BAC Home Loans Servicing, LP, ReconTrust Company, and Mortgage Electronic Registration Systems, Inc.*

**HILLMAN, District Judge**:

        This matter comes before the Court by way of Defendants Bank of America Corporation, Bank of America, N.A., BAC Home Loans

Servicing, LP, ReconTrust Company, N.A., and Mortgage Electronic Registration Systems, Inc.'s Motion to Dismiss Plaintiffs' Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons expressed below, Defendants' Motion shall be granted in its entirety.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This matter stems from a mortgage foreclosure action. Plaintiffs Jason D. Slimm, Brandi N. Slimm,[1] and Robert H. Obringer[2] own property in Camden County, New Jersey.[3]  (Compl. ¶¶ 4-6.)  Defendants Bank of America Corporation and Bank of America, N.A. (collectively hereinafter "Bank of America"),[4] BAC Home Loans Servicing, LP ("BAC"), ReconTrust Company, N.A.

---

[1]   Jason and Brandi Slimm are married.  For purposes of clarity, the Court refers to them collectively throughout this Memorandum Opinion as "the Slimms."  However, if referring to one of the Slimms in the singular context, the Court identifies the individual by his or her first name.

[2]   Although Plaintiffs are appearing pro se, the Court believes Robert H. Obringer to be an attorney.

[3]   Robert Obringer's relationship to the Slimms is not clear from the Plaintiffs' pleading.  It is also unclear whether the Slimms and Obringer jointly own a home, or whether they maintain two separate homes.

[4]   Plaintiffs bring suit against both Bank of America Corporation and Bank of America, N.A.  Bank of America, N.A. is a subsidiary of Bank of America Corporation.  Plaintiffs refer to these two entities collectively and interchangeably throughout their pleading.  As such, when addressing claims brought against both entities, the Court solely refers to "Bank of America."  If referring to one of the entities individually, however, the Court will identify that Defendant by its full name.

("ReconTrust"), Countrywide Financial Corporation

("Countrywide"),[5] and Mortgage Electronic Registration Systems

("MERS")[6] are financial institutions or private companies engaged

in the business of servicing mortgages.  (Id. ¶¶ 7-13.)

Defendant BAC Home Loans Servicing, LP ("BAC") is a subsidiary of

Bank of America that services defaulted mortgages.  (Id. ¶ 9.)

Defendant Federal Home Loan Mortgage Corporation ("Freddie Mac")

is a government-sponsored enterprise that services mortgages.

(Id. ¶ 14.)  Defendant Aurora Bank FSB ("Aurora Bank") is a

privately-held bank based in Wilmington, Delaware.  (Id. ¶ 15.)

Defendant CGW Realty is a real estate agency located in Cherry

Hill, New Jersey, and Defendant Denise Toft is one of its

associates.  (Id. ¶¶ 16, 17.)  Defendants Aurora, Freddie Mac,

CGW Realty, and Toft have not responded to Plaintiffs' Complaint,

and are not parties to the instant Motion to Dismiss.

Accordingly, the findings made in the instant Memorandum Opinion

only apply to Defendants Bank of America, BAC, ReconTrust, and

MERS.

On September 28, 2006, Plaintiffs executed a promissory note

---

[5]  Defendant Countrywide was acquired by Defendant Bank of
America in July of 2008.  (Compl. ¶ 11.)  As such, all claims
asserted against Countrywide are considered to be asserted
against its successor, Bank of America.

[6]  MERS is incorrectly identified in the case caption as
"MERSA."  The Court refers to Defendant by its proper title,
MERS.

evidencing a $187,267.00 mortgage loan at a six percent (6%) interest rate.  (Defs.' Mot. Dismiss, Ex. B, Note.)[7]  Pursuant to the terms of the Note, Plaintiffs were required to make a monthly payment of $1,122.76 to Aurora Bank for principal and interest due on the loan.  (Id.)  The Note was secured by a mortgage, also dated September 28, 2006, which formed a lien on their property.

---

[7] Defendants attached several documents to their Motion to Dismiss, including a copy of the Note and mortgage security instrument.  It is well-known that courts generally can only consider the allegations contained in the complaint, exhibits attached to the complaint, and matters of public record when deciding a motion to dismiss.  See Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993)(internal citations omitted).  Generally, if a motion to dismiss references documents outside the pleadings, it converts into a motion for summary judgment pursuant to Rule 12(d) of the Federal Rule of Civil Procedure.  See Prudential Ins. Co. of Amer. v. Eisen, No.Civ.A.11-05872, 2012 WL 876747, at *3 (E.D. Pa. Mar. 15, 2012) (citing Phat Van Le v. Univ. of Med. & Dentistry of N.J., No.Civ.A.09-2632, 2010 WL 1896415, at *4 (3d Cir. May 12, 2010))(further citation omitted).  The Third Circuit, however, has held that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."  Pension Benefit, 998 F.2d at 1196 (internal citations omitted).  The rationale for this exception to the general rule is that "[w]hen a complaint relies on a document . . . the plaintiff obviously is on notice of the contents of the document, and the need for a chance to refute evidence is greatly diminished."  Id. at 1196-97 (internal citation omitted).
   Here, Plaintiffs extensively rely on the contents of the Note and mortgage agreement in their allegations.  They also do not dispute their authenticity.  In fact, in their Response in Opposition, Plaintiffs explicitly state that: "It is undisputed that on or about September 28, 2006, Plaintiffs Jason D. Slimm and Robert H. Obringer had executed a Note to Aurora Financial Group, Inc., to secure a sum in the amount of $187,267.00 at a six percent interest rate, payable by October 1, 2036."  (Pls.' Resp. Opp'n at 7.)  As such, the Court will not convert Defendants' Motion to Dismiss into a summary judgment motion on this basis.

(Defs.' Mot. Dismiss, Ex. C, Mortgage Instrument.)  According to Plaintiffs, shortly after acquisition of the loan, Defendants Bank of America, BAC, and ReconTrust began to service the loan. (Compl. ¶ 12.)  It is unclear from the record when each company actually assumed service of the loan.  However, the record indicates that BAC transferred service of the loan to its parent company, Bank of America, N.A., on July 1, 2011.  (Pl.'s Resp. Opp'n, Obringer Cert., Ex. B ).

On March 10, 2010, Defendant Bank of America began to effectuate a foreclosure proceeding on Plaintiffs' property.[8] (Id. ¶ 31.)  On May 21, 2010, the Slimms contacted Bank of America to attempt to work out an arrangement by which they could avoid foreclosure and maintain possession of their home by participating in a loan modification.[9]  (Id. ¶ 36.)  According to Plaintiffs, Bank of America agreed to a modification of their loan agreement pursuant to the federal Home Affordable Modification Program in December of 2010.  (Id. ¶ 42.)

---

[8]  Plaintiffs contend that Defendant intentionally sent Obringer's foreclosure notice to an incorrect address.  (Id. ¶¶ 31-32.)

[9]  Plaintiffs contend that, despite requesting a loan modification, Bank of America commenced a foreclosure action against them on May 24, 2010 in New Jersey state court.  (Id. ¶ 37.)  In April of 2011, however, the parties signed a consent order in which Jason and Obringer withdrew their objections to the foreclosure.  (Id. ¶ 46; Defs.' Mot. Dismiss, Ex. D, Consent Order.)  Other than this, the state court foreclosure proceeding is not further discussed by the parties.

Plaintiffs contend that they agreed to participate in the loan modification program in January of 2011, and thereafter submitted all of the required documentation to Bank of America and were in frequent contact with its representatives, who repeatedly indicated to them that their modification was close to being approved and was "in the final stages." (Id. ¶¶ 45, 49.) On February 3, 2012, however, the Slimms received notification that their loan modification was denied. (Id.) Despite receipt of the denial letter, the Slimms aver that Bank of America continued to communicate with them after this, insisting that their modification was still being arranged and that "one additional document was needed." (Id. at ¶ 50.) Plaintiffs allege that they complied with every request made by Defendants, but that Defendants "intentionally and wrongfully toyed" with them during this process. (Id.)

Plaintiffs filed the instant Complaint before this Court on September 14, 2012, asserting violations of the Fair Debt Collection Practices Act, Fair Credit Reporting Act, New Jersey Consumer Fraud Act, promissory estoppel, Truth in Lending Act, and Racketeer Influenced and Corrupt Organizations Act. On October 31, 2012, Defendants filed the instant Motion to Dismiss Plaintiffs' Complaint in its entirety. Plaintiffs filed a Response in Opposition on November 19, 2012, to which Defendants replied on November 26, 2012. Plaintiffs then filed a sur-

6

reply[10] on November 28, 2012.  Accordingly, this matter is now ripe for judicial review.

## II. JURISDICTION

The Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.[11]  Specifically, this matter arises under 15 U.S.C. §§ 1601, 1692, 1681 and 18 U.S.C. § 1961.  Accordingly, the Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, and may exercise supplemental jurisdiction over Plaintiff's state law claims according to 28 U.S.C. § 1367.

---

[10]  Sur-reply briefs are not permitted under the District of New Jersey's Local Civil Rules.  See L. Civ. R. 7(d)(6).  In order to file a sur-reply, leave of court must be obtained.  In the absence of obtaining the court's permission, the court need not consider the party's supplemental submission and may strike it from the record.

Here, the Court is cognizant of the fact that Plaintiffs are pro se litigants that perhaps may be unfamiliar with the law and motions practice before this Court.  It has previously been recognized that pro se submissions should be afforded a more liberal reading and interpretation.  See Hibbert v. Bellmawr Park Mut. Housing Corp., --F.Supp.2d--, 2013 WL 1314395, at *4 (D.N.J. Mar. 28, 2013)(internal citations omitted).  Accordingly, the Court will consider the text of Plaintiffs' letter in its ensuing Discussion.

[11] Section 1331 provides that:

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

28 U.S.C. § 1331.

## III. STANDARD OF REVIEW

When considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff.  Evancho v. Fisher, 423 F.3d 347, 351 (3d Cir. 2005).  It is well settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Under the liberal federal pleading rules, it is not necessary to plead evidence, and it is not necessary to plead all the facts that serve as a basis for the claim.  Bogosian v. Gulf Oil Corp., 562 F.2d 434, 446 (3d Cir. 1977).  However, "[a]lthough the Federal Rules of Civil Procedure do not require a claimant to set forth an intricately detailed description of the asserted basis for relief, they do require that the pleadings give defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  Baldwin Cnty. Welcome Ctr. v. Brown, 466 U.S. 147, 149-50 n.3 (1984)(quotation and citation omitted).

A district court, in weighing a motion to dismiss, asks "'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim.'"  Bell Atlantic v. Twombly, 550 U.S. 544, 563 n.8 (2007) (quoting

8

Scheuer v. Rhoades, 416 U.S. 232, 236 (1974)); see also Ashcroft
v. Iqbal, 556 U.S. 662, 684 (2009) ("Our decision in Twombly
expounded the pleading standard for 'all civil actions' . . .
."); Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)
("Iqbal . . . provides the final nail-in-the-coffin for the 'no
set of facts' standard that applied to federal complaints before
Twombly.").

Following the Twombly/Iqbal standard, the Third Circuit has
instructed a two-part analysis in reviewing a complaint under
Rule 12(b)(6).  First, the factual and legal elements of a claim
should be separated; a district court must accept all of the
complaint's well-pleaded facts as true, but may disregard any
legal conclusions.  Fowler, 578 F.3d at 210 (citing Iqbal, 129 S.
Ct. at 1950).  Second, a district court must then determine
whether the facts alleged in the complaint are sufficient to show
that the plaintiff has a "'plausible claim for relief.'"  Id.
(quoting Iqbal, 129 S. Ct. at 1950).  A complaint must do more
than allege the plaintiff's entitlement to relief.  Id.; see also
Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008)
(stating that the "Supreme Court's Twombly formulation of the
pleading standard can be summed up thus: 'stating . . . a claim
requires a complaint with enough factual matter (taken as true)
to suggest' the required element.  This 'does not impose a
probability requirement at the pleading stage,' but instead

'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element").

A court need not credit either "bald assertions" or "legal conclusions" in a complaint when deciding a motion to dismiss. In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429-30 (3d Cir. 1997).  The defendant bears the burden of showing that no claim has been presented.  Hedges v. U.S., 404 F.3d 744, 750 (3d Cir. 2005) (citing Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)).

Finally, a court in reviewing a Rule 12(b)(6) motion must only consider the facts alleged in the pleadings, the documents attached thereto as exhibits, and matters of judicial notice.  S. Cross Overseas Agencies, Inc. v. Kwong Shipping Grp. Ltd., 181 F.3d 410, 426 (3d Cir. 1999).  A court may consider, however, "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."  Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).  If any other matters outside the pleadings are presented to the court, and the court does not exclude those matters, a Rule 12(b)(6) motion will be treated as a summary judgment motion pursuant to Rule 56.  Fed. R. Civ. P. 12(b).

10

## IV.  DISCUSSION

In the instant Motion to Dismiss, Defendants argue that each and every one of Plaintiffs' claims fail as a matter of law, and that the Complaint therefore must be dismissed in its entirety. Plaintiffs disagree, and contend that all of their claims are viable and withstand dismissal.  The Court considers each argument and response in turn below.

### A.    The Fair Debt Collections Practices Act

The Fair Debt Collection Practices Act ("FDCPA") prohibits the use of abusive, deceptive, and unfair debt collection practices by debt collectors.  15 U.S.C. § 1692, <u>et seq.</u>  In order to successfully bring a claim under the Act, a plaintiff must show that: (1) the defendant is a "debt collector," and (2) the defendant debt collector engaged in prohibited practices in an attempt to collect a debt.  <u>Siwulec v. Chase Home Fin., LLC</u>, No.Civ.A.10-1875, 2010 WL 5071353, at *2-3 (D.N.J. Dec. 7, 2010); <u>see also</u> <u>Pollice v. Nat'l Tax Funding, L.P.</u>, 225 F.3d 379, 403 (3d Cir. 2000); <u>FTC v. Check Inves., Inc.</u>, 502 F.3d 159, 171 (3d Cir. 2007).  A "debt collector" is defined under the Act as:

> [A]ny person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due [to] another.

15 U.S.C. § 1692a(6); <u>see also</u> <u>Pollice</u>, 225 F.3d at 403; <u>Glover</u>

v. FDIC, 698 F.3d 139, 152 n.8 (3d Cir. 2012).  Stated

differently, the FDCPA applies to entities and persons that

collect debts on behalf of others.  As such, it generally does

not apply to creditors attempting to collect debts on their own

behalf.[12]  See Staub v. Harris, 626 F.2d 275, 277 (3d Cir.

1980)("The [FDCPA] does not apply to persons or businesses

collecting debts on their own behalf."); Schaffhauser v. Citibank

(S.D.) N.A., 340 F. App'x 128, 130 n.4 (3d Cir. 2009); Aubert v.

Am. Gen. Fin., Inc., 137 F.3d 976, 978 (7th Cir. 1998)

("Creditors who collect in their own name and whose principal

business is not debt collection . . . are not subject to the Act.

. . . Because creditors are generally presumed to restrain their

abusive collection practices out of a desire to protect their

corporate goodwill, their debt collection activities are not

subject to the Act unless they collect under a name other than

their own.").  It has also been recognized that the FDCPA does

not apply to mortgage servicing companies if the loan in question

was not in default when acquired by the server.  See Stolba v.

Wells Fargo & Co., No.Civ.A.10-6014, 2011 WL 3444078, at *2

(D.N.J. Aug. 8, 2011) (citing Siwulec, 2010 WL 5071353 at *3;

Dawson v. Dovenmuehle Mortg., Inc., No.Civ.A.00-6171, 2002 WL

501499, at *5 (E.D. Pa. Apr. 3, 2002); Scott v. Wells Fargo Home

---

[12] A "creditor" is defined under the FDCPA as one who
"offers or extends to offer credit creating a debt or to whom a
debt is owed." 15 U.S.C. § 1692a(4).

12

Mortg. Inc., 326 F.Supp.2d 709, 718 (E.D. Va. 2003); James v.
Wells Fargo Bank, N.A., No.Civ.A.10-1205, 2011 WL 1874707, at *3
(D. Utah May 17, 2011)) (further citation omitted).

In order to place this matter in context, it is first
important to note the relationships of the parties here.  Under
these factual circumstances, Aurora Bank is the creditor to whom
the debt is owed because it is the entity that extended the
promissory note secured by the mortgage instrument.  (Compl. ¶¶
84-85.)  The debt was at some point in time purchased, assigned,
or transferred to several of the Defendants for collection
purposes.  (Id. ¶ 86.)  According to Plaintiffs, at varying
points in time, Defendants Bank of America, BAC, and ReconTrust
serviced the mortgage loan.  (Id. ¶¶ 12, 86.)[13]

Defendants argue that the FDCPA claims against them must be
dismissed because they are not considered "debt collectors" under
the definition provided by the Act.[14]  In response, Plaintiffs
argue that Defendants are subject to the FDCPA's terms because
they have purchased, assumed assignment of, or serviced their

_____

[13] Bank of America Corporation is alleged to be the parent
company of both BAC and ReconTrust.  (Id. ¶¶ 8-10.)  More
specifically, BAC is alleged to be a subsidiary of Bank of
America, and ReconTrust is averred to be Bank of America's
wholly-owned subsidiary.  (Id. ¶¶ 9, 10.)

[14] At no point in the Complaint do Plaintiffs assert that
Defendant MERS violated the FDCPA.  Rather, Plaintiffs' claims
appear to be limited to Defendants Bank of America, BAC, and
ReconTrust.  Accordingly, the Court does analyze the FDCPA claim
with respect to Defendant MERS.

debt for collection purposes.  In so arguing, Plaintiffs rely on a written letter sent to them by Defendant Bank of America in February of 2011 in which Defendant expressly stated in the "fine print" that "this communication is from a debt collector attempting to collect a debt."  (Pls.' Resp. Opp'n, Obringer Cert., Ex. B ).

Our sister court in this District previously addressed this precise scenario in Siwulec v. Chase Home Finance, LLC, 2010 WL 5071353 at *4-5.  In Siwulec, the plaintiff entered into a mortgage loan with Washington Mutual, Inc., and defendant Chase Home Finance began to service the loan shortly thereafter.  Id. at *1.  The plaintiff subsequently defaulted on the loan, and Chase sought to collect the debt.  Id.  The plaintiff brought suit, claiming that the defendant violated the FDCPA.  Id.  In so doing, the plaintiff relied on language contained in a written notice she received from Chase, which stated that: "We are a debt collector.  This is an attempt to collect a debt, and any information obtained will be used for that purpose."  Id.  The court, however, found that the defendant's own statement that it was a debt collector did not automatically mean that it was a debt collector for FDCPA purposes.  Id. at *5 (relying on Nwoke v. Countrywide Home Loans, Inc., 251 F. App'x 363 (7th Cir. 2007)).  Rather, in order for the defendant to be held liable under the FDCPA, the court found that it had to meet the

14

requirements of a debt collector as specifically defined in the Act.  <u>Siwulec</u>, 2010 WL 5071353 at *5.

This Court finds the reasoning of the <u>Siwulec</u> Court to be persuasive here.  Merely because Bank of America previously referred to itself as a debt collector in the fine print of a notice that it sent to Plaintiffs does not, in and of itself, mean that Defendant actually is considered to be a debt collector for purposes of FDCPA liability.  Rather, the proper inquiry here is whether Defendants are considered to be debt collectors under the definition provided by the FDCPA.

Plaintiffs allege that Defendants Bank of America, BAC, and ReconTrust are liable under the FDCPA because they "have either purchased the debt, been assigned the debt for collection or are servicers of the debt[.]" (Pls.' Resp. Opp'n at 13; Compl. ¶ 12.) As indicated above, it has previously been recognized that a mortgage servicing company is not considered to be a debt collector under the FDCPA if the loan in question was not in default when it was acquired by the server.  <u>See</u> <u>Stolba</u>, 2011 WL 3444078 at *2; <u>Siwulec</u>, 2010 WL 5071353 at *3; <u>Dawson</u>, 2002 WL 501499 at *5.  This is because the term "debt collector" does not include "any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity . . . concerns a debt which was not in default at the time it was obtained by such person."  15 U.S.C. §

1692a(6)(F).  In <u>Siwulec</u>, the court dismissed the plaintiff's
FDCPA claim because she failed to sufficiently allege that her
loan was in default at the time when the defendant began
servicing the loan.  2010 WL 5071353 at *5-6.  The court
specifically recognized that, "[w]hile Plaintiff is not required
at this stage to know the exact date Chase began servicing the
loan, she is required to plead some facts — rather than no facts
— that would raise her claim above the speculative level. . . .
Accordingly, the Court holds that Plaintiffs' allegations that
Chase is a 'debt collector' under the FDCPA are insufficient
under the <u>Iqbal</u> and <u>Twombly</u> standard."  <u>Id.</u>

Here, Plaintiffs likewise fail to allege that their debt was
in default when Defendants began servicing the loan.  As pointed
out by the <u>Siwulec</u> Court, while Plaintiffs are not required at
this stage to know the exact date when Defendants began servicing
the loan, they must at least plead enough facts to raise their
claims above the bar of speculation.  Plaintiffs here, however,
have not alleged when each Defendant assumed service of the loan,
when the loan was purchased or assigned from one Defendant to
another, or when they themselves defaulted on the loan.  All that
is alleged is that Bank of America, BAC, and ReconTrust all
"purchased and/or serviced the debt" at some point in time, and
that Bank of America commenced a foreclosure action against them
on March 10, 2010.  (Compl. ¶ 12, 31.)  Such threadbare

16

allegations are insufficient to satisfy the pleading requirements set forth under the Federal Civil Rules.

Moreover, the Court briefly pauses to specifically address Defendant Bank of America's potential role as a debt collector under the facts of this case.  On the one hand, Plaintiffs have pled that Bank of America was the specific entity that commenced a foreclosure action against them on March 10, 2010.  (Compl. ¶ 31.)  On the other hand, however, the record indicates that Defendant BAC transferred service of Plaintiffs' loan to its parent company, Bank of America, N.A., on July 1, 2011.  (Pls.' Resp. Opp'n, Obringer Cert., Ex. B)  Under these circumstances, if the foreclosure on Plaintiffs' property commenced in March of 2010, then the loan must have already been in default when Bank of America assumed service of it from BAC in July of 2011.  In such a scenario, it is possible that Bank of America could potentially be considered a debt collector if the obligation was already in default when the debt was assigned or transferred. Pollice, 225 F.3d at 403.

However, even if Plaintiffs could show that Bank of America was a debt collector under the FDCPA because the loan was already in default when it was transferred, they nonetheless would need to satisfy the second prong of the FDCPA in order for it to be held liable under the Act — *i.e.*, to show that Bank of America engaged in "prohibited practices" in an attempt to collect the

debt.  "Prohibited practices" under the FDCPA include: the use of violence, obscenity, and profane language; repeated annoying phone calls; and false representations about "the character, amount, or legal status of any debt."  O'Brien v. Valley Forge Specialized Educ. Servs., No.Civ.A.03-5695, 2004 WL 2580773, at *3 n.3 (E.D. Pa. Nov. 10, 2004) (citing 15 U.S.C. § 1692d-f). Other examples of prohibited practices include falsely representing that a dunning letter was sent by an attorney or that nonpayment would result in arrest or imprisonment, or otherwise indicating that the debtor committed a crime by failing to make payment on the loan.  See FTC v. Check Inv., Inc., 502 F.3d 159, 166 (3d Cir. 2007); see also Wallace v. Bank of Am., No.Civ.A.11—38, 2011 WL 3859745, at *6 (D.N.J. Aug. 30, 2011) (Simandle, J.)

Here, Plaintiffs allege that Defendants "used false and misleading tactics, harassment and unconscionably abusive tactics (including deception) causing [them] to feel oppressed and frustrated."  (Compl. ¶ 90.)  This allegation, however, is a mere parroting of the text of the statute.  The pleading requirements of the Federal Civil Rules require Plaintiffs to provide more than threadbare recitations.  The only indication of an abusive or misleading action in the Complaint with respect to the FDCPA is the allegation that Defendants reported false and inaccurate information about Plaintiffs to a credit reporting agency.  (Id.

18

¶ 91.)  The FDCA, however, explicitly exempts the release of

delinquent debt-payers' identities to consumer reporting agencies

from its definition of prohibited harassing and abusive conduct.

See 15 U.S.C. § 1692d(3).[15]  Therefore, even if Plaintiffs could

successfully show that Defendant Bank of America — or Defendants

BAC or ReconTrust, for that matter — met the definition of a

"debt collector" under the FDCPA, their claim would nonetheless

fail because they have not alleged that Defendants engaged in any

---

[15]  This statutory section states, in full, as follows:

A debt collector may not engage in any conduct the
natural consequence of which is to harass, oppress, or
abuse any person in connection with the collection of a
debt. Without limiting the general application of the
foregoing, the following conduct is a violation of this
section:
    (1) The use or threat of use of violence or other
    criminal means to harm the physical person,
    reputation, or property of any person.
    (2) The use of obscene or profane language or
    language the natural consequence of which is to
    abuse the hearer or reader.
    (3) The publication of a list of consumers who
    allegedly refuse to pay debts, except to a consumer
    reporting agency . . .
    (4) The advertisement for sale of any debt to coerce
    payment of the debt.
    (5) Causing a telephone to ring or engaging any
    person in telephone conversation repeatedly or
    continuously with intent to annoy, abuse, or harass
    any person at the called number.
    (6) . . . the placement of telephone calls without
    meaningful disclosure of the caller's identity.

15 U.S.C. § 1692d.

19

manner of debt collection practices prohibited by the Act. Accordingly, Plaintiffs' FDCPA claim brought against Bank of America, BAC, and ReconTrust shall be dismissed.

**B.    The Fair Credit Reporting Act**

The Fair Credit Reporting Act ("FCRA") was created by Congress to protect consumers from the transmission of inaccurate information and to promote credit reporting practices that utilize relevant and current information in a confidential and responsible manner.  Cortez v. Trans Union, LLC, 617 F.3d 688, 706 (3d Cir. 2010) (McKee, Chief J.) (internal citations omitted).  In drafting the statute, Congress sought to "'ensure fair and accurate credit reporting, promote efficiency in the banking system, [] protect consumer privacy,'" and to "preserve the consumer's privacy in the information maintained by consumer reporting agencies."  Fuges v. Southwest Fin. Servs., Ltd., 707 F.3d 241, 247 (3d Cir. 2012) (quoting Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 52 (2007)); Gelman v. State Farm Mut. Auto Ins. Co., 585 F.3d 187, 191 (3d Cir. 2009) (McKee, Chief J.).  A "consumer reporting agency" is defined under the statute as:

> [A]ny person which, for monetary fees, dues, or a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

20

15 U.S.C. § 1681a(f).  Under the Act, consumer reporting agencies may only release consumer credit reports for one of the purposes specifically permitted under the statute.  See Gelman, 585 F.3d at 191 (citing 15 U.S.C. § 1681b(a)).

Plaintiffs allege in their Complaint that Defendant Bank of America reported "false and inaccurate information" to credit reporting agencies based on the foreclosure of their property, and that it closed Plaintiff Obringer's line of credit without advising him that it was doing so.[16]  (Compl. ¶¶ 33, 35, 91.) Although Plaintiffs have not specified which subsection of the FCRA they rely on in making these allegations, it appears as though their claim is rooted in § 1681s-2 of the Act, as that is the provision governing the reporting of credit information that is false and inaccurate.  This section, in turn, is further delineated into subsections, of which (a) and (b) are relevant here.

Subsection (a) provides that: "A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate."  15 U.S.C. § 1681s-

---

[16]  Plaintiffs do not make any allegations in their Complaint from which the Court can infer that they intended to assert their FCRA claim against Defendants BAC, ReconTrust, or MERS. Accordingly, the Court solely considers this claim as having been made against Defendant Bank of America.

2(a)(1)(A).  The Third Circuit has expressly recognized that no

private right of action exists under the provisions of § 1681s-

2(a).[17]  Huertas v. Galaxy Asset Mgmt., 641 F.3d 28, 34 (3d Cir.

2011)(internal citations omitted); SimmsParris v. Countrywide

Fin. Corp., 652 F.3d 355, 358 (3d Cir. 2011); see also Parades v.

Sallie Mae, No.Civ.A.11-2470, 2011 WL 5599605, at *4-5 (D.N.J.

Nov. 16, 2011) (Hillman, J.).  Indeed, only the Government can

pursue such claims against consumer reporting agencies.  Noel v.

First Premier Bank, No.Civ.A.12-50, 2012 WL 832992, at *5 (M.D.

Pa. Mar. 12, 2012) (citing SimmsParris, 652 F.3d at 358).  Since

Plaintiffs here are private entities that bear no relationship to

the Government, their claims under this subsection cannot

---

[17]  This holding by the Third Circuit is consistent with the
interpretation of § 1681s-2(a) by many of its sister Courts of
Appeals. See e.g., Chiang v. Verizon New England Inc., 595 F.3d
26, 35 (1st Cir. 2010)("Congress expressly limited furnishers'
liability under § 1681s-2(a) by prohibiting private suits for
violations of that portion of the statute."); Saunders v. Branch
Banking & Tr. Co. of Va., 526 F.3d 142, 149 (4th Cir. 2008)
("FCRA explicitly bars private suits for violations of §
1681s2(a)[.]"); Bach v. First Union Nat'l Bank, 149 F. App'x 354,
358-59 (6th Cir. 2005)("[A] consumer cannot bring a private cause
of action for a violation of a furnisher's duty to report
truthful information" under Section 1681s-2(a)); Young v. Equifax
Credit Info. Servs., Inc., 294 F.3d 631, 639 (5th Cir. 2002);
Purcell v. Bank of Am., 659 F.3d 622 (7th Cir. 2011)(finding
"that section [1681s-2(a)] does not create a private right of
action."); Gorman v. Wolpoff & Abramson, LLP, 584 F.3d 1147, 1162
(9th Cir. 2009) (recognizing that plaintiff had "no private right
of action under § 1681s-2 (a)(3) to proceed against [a furnisher
of information] for its initial failure to notify the CRAs that
he disputed the . . . charges").

survive.  Accordingly, to the extent Plaintiffs' FCRA claims are premised upon subsection (a) of the statute, they shall be dismissed.

Subsection (b) of the statute addresses the "[d]uties of furnishers upon notice of a dispute," and states, in pertinent part, as follows:

> After receiving notice . . . of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall—
>
>> (A) conduct an investigation with respect to the disputed information;
>>
>> (B) review all relevant information provided by the consumer reporting agency . . . ;
>>
>> (C) report the results of the investigation to the consumer reporting agency;
>>
>> (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and
>>
>> (E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly—
>>
>>> (I) modify that item of information;
>>>
>>> (ii) delete that item of information; or
>>>
>>> (iii) permanently block the reporting of that item of information.

15 U.S.C. § 1681s-2(b)(1).  "[S]ubsection (b) relates to the

furnisher's obligations after learning of inaccuracies from the credit reporting agency.  Thus, whereas § 1681s-2(a) purports to require furnishers of information to ensure the accuracy of that information before transmitting it to a credit reporting agency, § 1681s-2(b) requires that furnishers take certain steps to investigate and correct inaccurate information they [may] have already relayed to the credit reporting agencies."  Paredes, 2011 WL 5599605 at *4 (citing Burrell v. DFS Servs., LLC, 753 F.Supp.2d 438, 446 (D.N.J. 2010)).  Moreover, unlike claims brought under subsection (a), subsection (b) may serve as the basis for a private cause of action if the furnisher of credit information receives notice from a reporting agency that a consumer disputes the information.  See Paredes, 2011 WL 5599605 at *5 (citing Cosmas v. Am. Express Centurion Bank, No.Civ.A.07-6099, 2010 WL 2516468, at *7 (D.N.J. June 14, 2010)("Private rights of action are permitted for claims brought under section 1681s-2(b) where the furnisher has received notice of a dispute from a credit collection agency.")) (further citation omitted). In order for an individual plaintiff to successfully bring a private suit under subsection (b), he must first demonstrate the following three elements:

> (1) That the consumer sent notice of disputed information to a consumer reporting agency,
> (2) The consumer reporting agency then notified the defendant furnisher of the dispute, and
> (3) The furnisher failed to investigate and modify the

inaccurate information.

Paredes, 2011 WL 5599605 at *5 (internal citations omitted).

In the instant case, Plaintiffs allege that Bank of America — the furnisher of the information — provided false and inaccurate information to credit reporting agencies.  More specifically, Plaintiffs baldly state that "Bank of America closed Mr. Obringer's line of credit and notified credit reporting agencies. . . . Noification [*sic*] to the Credit Reporting Agencies of the foreclosure when Mr. Obringer himself was not notified constitutes a FCRA violation."  (Compl. ¶¶ 33, 35.)  Plaintiffs further allege that Defendants "reported inaccurate and false information to the credit reporting agencies and have refused or are unable to correct the reporting."  (Id. ¶ 91.)  By way of these statements, Plaintiffs have not fulfilled the three elements of a § 1681s-2(b) claim.  Indeed, they have failed to plead any facts indicating that they sent notice of the allegedly false and inaccurate credit information to a reporting agency, that the agency notified Bank of America of the dispute, and that Bank of America failed to investigate and modify the information.  Instead, their allegations ring hollow as factually unsupported conclusory statements.  The Federal Civil Rules require more than just unsubstantiated allegations to survive dismissal.  Thus, to the extent Plaintiffs seek to bring their FCRA claim under subsection (b) of the statute, such a claim will likewise be dismissed for failure to satisfy the pleading

25

requirements of the Federal Civil Rules.[18]

## C.   The Home Affordable Modification Program

The Home Affordable Modification Program ("HAMP"), codified at 12 U.S.C. § 5201 et seq., was authorized by Congress as part of the Emergency Economic Stabilization Act of 2008, and grants the Secretary of the Treasury the "authority and facilities"

---

[18]   In conjunction with their claims under the FDCPA and FCRA, Plaintiffs cursorily allege that Defendants' false and misleading conduct also violated the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), and the New Jersey Fair Foreclosure Act.   (Compl. ¶¶ 34, 52.)

The FTC Act does not provide for a private right of action. See Doty v. Bayview Fin. LP, No.Civ.A.08-4090, 2009 WL 457569, at *1 n.3 (D.N.J. Dec. 4, 2009) (Irenas, J.) (citing Holloway v. Bristol-Meyers Corp., 485 F.2d 986 (D.C. Cir. 1973)); Polansky v. Trans World Airlines, Inc., 523 F.2d 332, 339 (3d Cir. 1975). Indeed, "courts have consistently refused to imply a private remedy from [FTC Act] on the ground that a private remedy would undercut the statutory scheme which grants the agency discretion to determine what is an unfair practice in any given factual contest."   Id. at 339 (internal citations omitted).   Thus, to the extent Plaintiffs meant to bring a claim under the FTC Act, such a claim will be dismissed for failure to state a claim upon which relief can be granted.

With respect to Plaintiffs' claims predicated upon the New Jersey Fair Foreclosure Act, the Court notes that Plaintiffs only cursorily refer to this Act in one paragraph of their lengthy pleading, in stating that "[f]ailure to comply with the New Jersey Fair Foreclosure Act constitutes a false and deceptive practice and a separate violation of the FDCPA and FCRA." (Compl. ¶ 34.)   The Third Circuit has previously recognized that "passing reference" to an issue is insufficient to put the opposing party on notice that relief is requested as to that particular issue.   See Laborers Int'l Union v. Foster Wheeler Energy, 26 F.3d 375, 398 (3d Cir. 1994) (quoting Simmons v. City of Phila., 947 F.2d 1042, 1066 (3d Cir. 1991)); see also Jurista v. Amerinox Processing, Inc., -- F.Supp.2d --, No.Civ.A.12-3825, 2013 WL 1405903, at *45 (D.N.J. Apr. 5, 2013) (Hillman, J.). Accordingly, to the extent Plaintiffs sought to bring a claim against Defendants under the New Jersey Fair Foreclosure Act, such a claim likewise shall be dismissed.

necessary to "restore liquidity and stability to the financial system of the United States" and "preserve homeownership."  12 U.S.C. § 5201 et seq.; see also Nelson v. Bank of Am., N.A., 446 F. App'x 158, 159 (11th Cir. 2011); Keosseian v. Bank of Am., No.Civ.A.11-3478, 2012 WL 458470, at *2 (D.N.J. Feb. 10, 2012). The Act is designed to "assist at-risk homeowners by promoting loan modifications and reducing monthly mortgage payments."  Id. at *5-6.

In their Complaint, Plaintiffs assert a wide array of allegations related to Defendants' obligations under HAMP, including a claim for promissory estoppel.  (Compl. ¶¶ 24-30, 42-45.)  Plaintiffs aver that Defendants agreed to a permanent modification of their loan pursuant to HAMP in December of 2010, but subsequently refused to comply with the terms of the loan modification.[19]  (Id. ¶¶ 42-47.)  Plaintiffs specifically allege that "Defendants promised in writing and verbally that [they]

_____

[19]  Plaintiffs spend a significant portion of their pleading providing background on the promulgation and enactment of the HAMP statute and discussing a February 2012 settlement that Bank of America entered into with the Office of the Controller of the Currency ("OCC") regarding certain servicing and foreclosure practices at the company.  (Compl. ¶¶ 19-30, 59-60.)  To the extent Plaintiffs rely on the settlement agreement reached between Bank of America and the OCC, however, such claims will be dismissed because Plaintiffs lack standing to sue to enforce the terms of that settlement.  See Rottlund Homes of N.J., Inc. v. Saul Ewing Remick & Saul, LLP, 243 F.Supp.2d 145, 153 (D. Del. 2003)(recognizing that only parties to a contract, and therefore a settlement agreement, have standing to enforce its terms and sue for a breach of the agreement).

would not proceed with the foreclosure process while Plaintiffs were in negotiation with Defendants in regards to a loan modification." (Compl. ¶ 62.) Plaintiffs thus contend that they detrimentally relied on Defendants' promises to modify their loan, and suffered financial injuries as a result of Defendants' "deceptive conduct." (Id. ¶¶ 42-47, 64-65.)

As an initial matter, Plaintiffs' promissory estoppel claim is intertwined with their allegations that Defendants failed to comply with their obligations under HAMP. A review of the record indicates that the majority of Plaintiffs' allegations arise from the alleged promises related to the processing of their loan modification under HAMP. As such, their promissory estoppel claim is not separate and apart from their claims under HAMP. The Third Circuit, however, has recently recognized that there is no private cause of action under HAMP. See Sinclair v. Citi Mortg., Inc., No.Civ.A.12-4261, 2013 WL 1010617, at *1 (3d Cir. Mar. 15, 2013); see also Keosseian, 2012 WL 458470 at *2; Stolba v. Wells Fargo, No.Civ.A.10-6014, 2011 WL 3444078, at *3 (D.N.J. Aug. 8, 2011); Wallace v. Bank of Am., No.Civ.A.11-0038, 2011 WL 3859745, at *2 n.3 (D.N.J. Aug. 30, 2011); In re O'Biso, 462 B.R. 147, 150 (Bankr. D.N.J. 2011); O'Connor v. First Alliance Home Mortg., No.Civ.A.12-111, 2012 WL 762351, at *3 (D.N.J. Mar. 6, 2012); Dente v. Saxon Mortg., No.Civ.A.11-6933, 2012 WL 1664127, at *4 (D.N.J. May 11, 2012). Therefore, given that Plaintiffs'

28

promissory estoppel claim is subsumed within their HAMP claims
and there is no private cause of action under HAMP, this portion
of their Complaint must be dismissed.  See Keosseian, 2012 WL
458470 at *2 n.3 ("[A]ll of Plaintiffs' claims are premised on
Defendant's denial of their loan modification request and alleged
failure to comply with its obligations under HAMP . . . Thus,
because Plaintiffs' asserted causes of action are not
sufficiently independent of HAMP, their Complaint must be
dismissed it its entirety.").

In their Response in Opposition to Defendants' Motion,
Plaintiffs assert for the first time that their promissory
estoppel claim is not based upon the loan modification, but
rather is premised upon Bank of America's promise to "make a fair
and honest review" of their loan modification request.  (Pls.'
Resp. Opp'n at 15.)  First, the Court is skeptical of how this
characterization of the promissory estoppel claim makes it any
less interconnected with HAMP.  In fact, this characterization is
possibly even more interrelated with HAMP, as it directly relates
to the method of processing and review of the loan modification
request.

In any event, even if the claim was somehow independent of
HAMP, it would nonetheless fail because Plaintiffs have not
sufficiently made out a viable promissory estoppel cause of
action.  In order to do so, a plaintiff must first show that an

express promise existed between the parties.  See O'Biso, 462

B.R. at 151.[20]  In the instant case, rather than expressly

agreeing to a final modification of Plaintiffs' loan, Defendants

initially agreed to permit Obringer and the Slimms to partake in

a Trial Period Plan ("TPP").  More specifically, Defendants sent

Plaintiffs a letter communication stating as follows:

> Congratulations. We have determined that you are eligible
> for the FHA Home Affordable Modification Program ("FHA-
> HAMP").  Enclosed is your FHA-HAMP Trial Period Plan and
> coupons to make payments under that Trial Period Plan. .
> . . After you successfully complete your Trial Period
> Plan by making three payments, we will send you
> additional documents. These documents will include a
> Partial Claim and FHA-Home Affordable Loan Modification
> Agreement that you will need to sign and return before
> your loan will be permanently modified.  Please read the
> enclosed documents carefully, and follow the instructions
> for making payments and signing and returning documents.

(Pls.' Resp. Opp'n, Brandi Slimm Cert., Ex. A.)  It has

previously been recognized that TPPs are "explicitly not []

enforceable offer[s] for loan modification[s]."  See O'Biso, 462

B.R. at 151; Stolba, 2011 WL 3444078 at *3,5 (citing Vida v.

OneWest Bank, FSB, No.Civ.A.10-987, 2010 WL 5148473, at *6 (D.

Or. Dec. 13, 2010)); Bourdelais v. J.P. Morgan Chase,

No.Civ.A.10-670, 2011 WL 1306311, at *5 (E.D. Va. Apr. 1, 2011).

---

[20]  More specifically, under New Jersey law, a promissory
estoppel claim is comprised of the following four elements: (1) a
express promise, (2) made with the expectation that the promisee
will rely on it, (3) reasonable reliance, and (4) definite and
substantial detriment.  Toll Bros., Inc. v. Bd. of Chosen
Freeholders of Cnty. of Burlington, 944 A.2d 1, 19 (N.J. 2008)
(internal citation omitted).

This is because TPPs serve as precursors to final loan modifications, and therefore are largely conditional in nature.

In O'Biso, the debtor took out a mortgage on her property, but eventually fell behind on her mortgage payments.  462 B.R. at 149.  When the bank attempted to foreclose on the property, the debtor requested a loan modification pursuant to HAMP.  Id.  The bank provisionally agreed to the modification by permitting the debtor to partake in a TPP.  Id.  The debtor averred that she made numerous payments under the TPP and provided all necessary documentation to the bank.  Id.  The bank, however, alleged that the debtor did not make all the necessary payments, and therefore proceeded to foreclose on her property, which lead to her eventual bankruptcy filing.  Id.  During the course of the bankruptcy proceedings, the debtor challenged the bank's proof of claim, arguing, *inter alia*, that the claim should be expunged because she justifiably relied on the bank's promise to enter into a final loan modification with her.  Id. at 151.  The court disagreed, finding that there was no evidence in the record to suggest that the bank guaranteed or made an express promise of a final loan modification when it provisionally agreed to the TPP.  Id.  Rather, the court found the language of the TPP to be conditional in nature, and not demonstrative of an express promise to finally modify the loan.  Id.  Thus, the court dismissed the debtor's promissory estoppel claim because "there

31

can be no justifiable reliance without an express promise[.]"
Id.

This Court finds the reasoning of the O'Biso Court to be
persuasive under the instant circumstances.  Just as in that
case, Plaintiffs here have not pled — and there is no evidence to
suggest — that Defendants guaranteed or made an express promise
of a final loan modification.  Indeed, the letter communication
from Defendants to Plaintiffs does not expressly promise
Plaintiffs a formal and final modification of their loan.  To the
contrary, rather than agreeing to and promising a final loan
modification, Defendants agreed to permit Obringer and the Slimms
to provisionally partake in a TPP.  The express language of
Defendants' letter is conditional in nature, indicating that
Plaintiffs would need to satisfy certain prerequisites prior to
obtaining a final loan modification.  (See Pls.' Resp. Opp'n,
Brandi Slimm Cert., Ex. A.)  Thus, although the Court accepts as
true Plaintiffs' allegations that they timely made their TPP
payments and filed the required documents, it need not disregard
the plain language of Defendants' letter communication and accept
Plaintiffs' legal conclusion that they were promised a permanent
modification of their loan and detrimentally relied on this
promise.  See Stolba, 2011 WL 3444078 at *9 ("Although the Court
accepts as true Plaintiffs' factual allegations that they timely
made TPP payments and provided the requisite documentation, the

plain language of the relevant TPP documents makes clear that satisfying the TPP conditions for permanent modification does not guarantee that Plaintiff would receive such modification."); Bourdelais, 2011 WL 1306311 at *5.  Indeed, the lack of an express promise of a final loan modification is further evidenced by the fact that Plaintiffs have failed to assert a start or end date, monthly payment amount, interest rate, or any terms and conditions of such a purported loan modification.  Nor have Plaintiffs pled any facts or pointed to any instances in which they requested but were denied a "fair and honest review" of their loan modification by Defendants.

Based on the above, the Court finds that Plaintiffs' promissory estoppel claim cannot survive since it is not sufficiently independent of their claims premised upon HAMP, which does not provide for a private cause of action.  Even if their promissory estoppel claim was somehow independent of HAMP, however, it nonetheless would fail because Plaintiffs have not alleged the existence of an express promise to finally modify their loan.  Accordingly, Plaintiffs' promissory estoppel claim shall be dismissed.

D.   **The New Jersey Consumer Fraud Act**[21]

Plaintiffs further aver that Defendants violated the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. 56:8-1 et seq.,[22] because they "made false promises and used deception, deceptive practices, and/or misrepresentations in connection with mortgage modifications."  (Compl. ¶ 54.)  Defendants argue that Plaintiffs' claims on this point must be dismissed because they have not made out a claim under the NJCFA in their pleading.[23]

_____

[21]   In their Complaint, Plaintiffs also cursorily allege that "[f]ailure to comply with the New Jersey Fair Foreclosure Act constitutes a false and deceptive practice[.]" (Compl. ¶ 34.) For the reasons expressed above in Footnote 18, infra, to the extent Plaintiffs attempt to bring a claim under the New Jersey Fair Foreclosure Act in conjunction with their NJCFA claim, such a claim will be dismissed.

[22]   Plaintiffs mistakenly refer to this statutory section as the New Jersey Deceptive Trade Practices Act.  Analogous statutes in other states bear titles such as Deceptive Trade Practice Act, Unfair Trade Practice Act, or other similar names.  See Harper v. LG Elec. USA, Inc., 595 F.Supp.2d 486, 489 n.4 (D.N.J. 2009) (identifying analogous statutes in Colorado, Connecticut, Florida, Michigan, New York, North Carolina, Pennsylvania, Texas, and Wisconsin).  The proper title of New Jersey's deceptive trade practices act is the New Jersey Consumer Fraud Act.  Id.  As such, the Court construes Plaintiffs' claims as being brought under the properly-titled statute.

[23]  In response to Defendants' argument, Plaintiffs assert that their claim should not be dismissed under the "Old English Rule" of "falsum in uno, falsum in omnibus," which translates to mean "false in one, false in all."  Plaintiffs' argument appears to be premised upon other similar legal actions in which the legality of Defendants' conduct was called into question. The Court is unclear as to what other legal actions Plaintiffs sporadically refer to in their opposition papers and throughout their pleading.  To the extent Plaintiffs attempt to bring suit under Bank of America's 2012 settlement agreement with the OCC, as noted above, they lack standing to do so as they are

As an initial matter, similar to their above-discussed promissory estoppel claim, Plaintiffs' NJCFA claim likewise does not appear to be sufficiently independent of HAMP.  Indeed, the entire premise of Plaintiffs' claim under the NJCFA is that Defendants engaged in false and unlawful deceptive practices "in connection with mortgage modifications."  (Id.)  Such an allegation is directly related to Defendants' obligations under HAMP.  Indeed, other courts in this District have previously dismissed similar claims on these grounds.  See Keosseian v. Bank of Am., No.Civ.A.11-3478, 2012 WL 458470, at *2 n.3 (D.N.J. Feb. 10, 2012) ("[A]lthough the Complaint purports to [a] state separate cause[] of action for . . . violation of the NJCFA, all of Plaintiffs' claims are premised on Defendant's denial of their loan modification request and alleged failure to comply with its obligations under HAMP[.]  Thus, because Plaintiffs' asserted causes of action are not sufficiently independent of HAMP, their Complaint must be dismissed in its entirety.").  Accordingly, since there is no private right of action under HAMP, Plaintiffs' NJCFA claim should be dismissed for failure to state a claim upon which relief can be granted.

---

not parties to that action.  In the alternative, if Plaintiffs rely on their 2011 state court litigation with Defendants BAC and Countrywide, this legal matter is separate and apart from the instant litigation and was previously resolved by the entry of a consent order, which Plaintiffs voluntarily signed. (Defs.' Mot. Dismiss, Bender Cert., Ex. D.)  Accordingly, the Court declines to give merit to Plaintiffs' argument that dismissal is unwarranted under the rule of falsum in uno, falsum in omnibus.

However, even if Plaintiffs' NJCFA claim was sufficiently independent of HAMP, it nonetheless would not survive dismissal because Plaintiffs have not pled their claim in accordance with the heightened pleading standards of Federal Civil Rule 9.  This Rule provides that, when alleging a cause of action based upon fraud, "a party must state with particularity the circumstances constituting fraud[.]"  Fed. R. Civ. P. 9(b).  This requirement may be satisfied by pleading "the date, time and place" of the alleged fraud or deception, or through alternative means that "otherwise inject precision or some measure of substantiation" into the allegation.  Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007)(citing Lum v. Bank of Am., 361 F.3d 217, 224 (3d Cir. 2004)).  In order to survive dismissal, plaintiffs must also allege "who made a misrepresentation to whom and the general content of the misrepresentation."  Gray v. Bayer Corp., No.Civ.A.08-4716, 2010 WL 1375329, at *3 (D.N.J. Mar. 31, 2010) (citing Lum, 361 F.3d at 224).  Furthermore, Rule 9(b) applies with equal force to fraud actions brought under federal statutes as to those actions that are based on state law but brought in federal court.  See Frederico, 507 F.3d at 200; Christidis v. First Pa. Mortg. Tr., 717 F.2d 96, 99 (3d Cir. 1983).

In order to state a claim under the NJCFA, a plaintiff must allege: (1) unlawful conduct by the defendants; (2) an ascertainable loss on the part of the plaintiff; and (3) a causal

36

relationship between the defendants' unlawful conduct and the plaintiff's ascertainable loss.  Mason v. Coca-Cola, 774 F.Supp.2d 699, 702 (D.N.J. 2011) (Hillman, J.) (citing Frederico, 507 F.3d at 202).  In connection with real estate, the Act provides that:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any [] real estate . . . is declared to be an unlawful practice[.]

N.J.S.A. § 56:8-2; see also Bianchi v. Lazy Days R.V. Ctr., Inc., No.Civ.A.06-1979, 2007 WL 1959268, at *3 (D.N.J. July 5, 2007); Ramirez v. STi Prepaid LLC, 644 F.Supp.2d 496, 500 (D.N.J. 2009); S. Broward Hosp. Dist. v. MedQuist, Inc., 516 F.Supp.2d 370, 399 (D.N.J. 2007)(Simandle, J.).  It has previously been recognized that, in order to sufficiently allege a cause of action under this provision of the statute, "'[t]he misrepresentation has to be one which is material to the transaction . . . [and] made to induce the buyer to make the purchase.'"  Castro v. NYT Television, 851 A.2d 88, 95 (N.J. Super. 2004) (quoting Gennari v. Weichert Co. Realtors, 691 A.2d 350, 366 (1997)).

Therefore, in accord with the plain language of the statute, in order for Plaintiffs' NJCFA claim to survive, they must show that Defendants suppressed or concealed a material fact and

mislead them in connection with "the sale or advertisement" of
their real estate.  N.J.S.A. § 56:8-2.  Plaintiffs present
allegations, however, are not premised upon the sale or
advertisement of their property.  Rather, they argue that
Defendants engaged in false and unlawful deceptive practices "in
connection with mortgage modifications."  (Compl. ¶ 54.)  As
such, the complained-of conduct falls outside the ambit of the
NJCFA.

     Moreover, even if it was encompassed within the Act,
Plaintiffs have not shown that Defendants' alleged
misrepresentations were material to any transaction and induced
them to enter into the mortgage agreement in the first instance.
Plaintiffs do not state with reasonable particularity the
circumstances constituting deception or misrepresentation — as is
required for such actions under Rule 9(b) — let alone point to
the alleged date, time, or place of the deception or indicate
"who made a misrepresentation to whom and the general content of
the misrepresentation."  Gray, 2010 WL 1375329 at *3 (internal
citation omitted).

     As such, based on the above, the Court finds that
Plaintiffs' claims under the NJCFA cannot be sustained because
they are not sufficiently independent of HAMP, and there is no
private cause of action under HAMP.  The Court further notes
that, even if Plaintiffs' NJCFA claim was somehow independent of

38

HAMP, it would nonetheless fail because their assertions are not encompassed within the provisions of the NJCFA and fail to meet the heightened pleading standards of Federal Civil Rule 9(b).  As such, Plaintiffs' NJCFA claim will be dismissed from suit.[24]

---

[24]  In Count III of the Complaint, Plaintiffs request the Court to enter an injunction preventing Defendants from foreclosing on their property.  Plaintiffs base their request for injunctive relief on Defendants' alleged violation of the NJCFA. (See Compl. ¶ 70.)

Injunctions are extraordinary remedies that are not routinely granted.  Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd., 357 F.3d 1319, 1324 (Fed. Cir. 2004).  The Court examines the following four factors in determining whether injunctive relief is appropriate in a given case:

(1)  Whether the movant shows a reasonable likelihood of success on the merits;
(2)  Whether the movant will be irreparably harmed by denial of the injunctive relief sought;
(3) Whether the injury to the movant in the absence of injunctive relief outweighs the possible harm to the non-movant if the injunction is granted; and
(4) The impact of a preliminary injunction on the public interest.

Abbott Labs. v. Andrx Pharms., Inc., 452 F.3d 1331, 1334 (Fed. Cir. 2006).  The movant bears the burden of demonstrating that the injunction it seeks should issue, and "cannot be granted a preliminary injunction unless it establishes both of the first two factors, i.e., likelihood of success on the merits and irreparable harm."  Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1350 (Fed. Cir. 2001).  The Court, however, must generally weigh all four factors in making its determination. See id. Indeed, our Court of Appeals has previously recognized that "an injunction shall issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief."  Conestoga Wood Specialties Corp. v. Sec'y of U.S. Health & Human Servs., App.No.13-1144, 2013 U.S. App. LEXIS 2706, at *4 (3d Cir. Feb. 7, 2013) (citing N.J. Hosp. Ass'n v. Waldman, 73 F.3d 509, 512 (3d Cir. 1995)).

Here, Plaintiffs' request for injunctive relief fails at the

### E.    The Truth in Lending Act[25]

The Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 <u>et seq.</u>, is a "federal consumer protection statute, intended to promote the informed use of credit by requiring certain uniform

---

outset because they have not shown that they are likely to prevail on the merits of their NJCFA claim.  In fact, as discussed above, this claim has been dismissed from suit as Plaintiffs cannot successfully establish a claim under the NJCFA. Moreover, even if Plaintiffs did show a reasonable likelihood of success on the merits of their NJCFA claim, they nonetheless have failed to address the remaining three elements necessary to obtain injunctive relief — <i>i.e.</i>, irreparable harm, balance of the equities, and the public interest.  As such, Plaintiffs' request for injunctive relief is denied, and Count III shall be dismissed from suit.

[25]  Plaintiffs do not specify which Defendants they bring their TILA claim against, although it appears from the context of their Complaint that they solely assert this claim against Defendant Bank of America.  However, since Plaintiffs are proceeding in this matter <u>pro se</u> and the Court is required to view their pleading liberally, <u>see</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007), out of an abundance of caution, the Court will construe the TILA claim as being brought against the other Defendants as well.  At the outset, however, the Court dismisses this claim against Defendant MERS, as it has previously been recognized by numerous federal courts that MERS is neither a creditor nor assignee as defined by TILA, and therefore cannot be held liable under its terms.  <u>See</u> <u>Cannon v. U.S. Bank, N.A.</u>, No.Civ.A.11-79, 2011 WL 2117015, at *6 (D. Haw. May 24, 2011) (internal citations omitted) ("Defendant MERS is neither a creditor nor assignee as defined by TILA."); <u>Ward v. Sec. Atl. Mortg. Elec. Reg. Sys., Inc.</u>, 858 F.Supp.2d 561, 567 (E.D.N.C. 2012); <u>Reyes v. WMC Mortg. Corp.</u>, No.Civ.A.11-1988, 2012 WL 1067560, at *2 (N.D. Cal. Mar. 28, 2012); <u>Stovall v. Nat'l Default Servs. Corp.</u>, No.Civ.A.10-585, 2011 WL 1103582, at *2 (D. Nev. Mar. 23, 2011); <u>GMAC Mortg., LLC v. McKeever</u>, Nos.Civ.A.08-459 & 08-510, 2010 WL 2639828, at 3 (E.D. Ky. June 29, 2010); <u>Horton v. Country Mortg. Servs., Inc.</u>, No.Civ.A.07-6530, 2010 WL 55902, at *3 (N.D. Ill. Jan. 4, 2010); <u>Pennington v. EquiFirst Corp.</u>, No.Civ.A.10-1344, 2011 WL 322818, at *5 (D. Kan. Jan. 31, 2011).

disclosures from creditors." <u>In re Cmty. Bank of N. Va. & Guar.</u>
<u>Nat'l Bank of Tallahassee Second Mortg. Loan Litig.</u>, 418 F.3d
277, 303 (3d Cir. 2005); <u>see also</u> <u>Beach v. Ocwen Fed. Bank</u>, 523
U.S. 410, 412 (1998).  The statute is implemented by Regulation
Z, 12 C.F.R. §§ 226.1 <u>et seq.</u>, which was promulgated by the Board
of Governors of the Federal Reserve System.  <u>Cmty. Bank</u>, 418 F.3d
at 303.  The Act was created to address "'divergent and often
fraudulent practices by which credit customers were apprised of
the terms of the credit extended to them.'"  <u>Williams v. Empire</u>
<u>Funding Corp.</u>, 109 F.Supp.2d 352, 357 (E.D. Pa. 2000) (quoting
<u>Smith v. Fid. Consumer Disc. Co.</u>, 898 F.2d 896, 898 (3d
Cir.1990)) (further citation omitted).  In enacting the statute,
Congress sought to assure a meaningful disclosure of credit terms
so that the consumers could compare prices and avoid uninformed
use of credit, as well as to protect consumers from inaccurate
and unfair billing and credit card practices.  <u>Williams</u>, 109
F.Supp.2d at 357 (citing 15 U.S.C. § 1601(a)).  Moreover, it has
been recognized that TILA should be construed liberally in favor
of consumers since it is a statute that is remedial in nature.
<u>Smith</u>, 898 F.2d at 898.  In accord with this statutory purpose,
creditors are required to make "material disclosures" to
consumers with whom they enter into loan transactions.  <u>Cmty.</u>
<u>Bank</u>, 418 F.3d at 304.  With respect to loans secured by a
borrower's principal dwelling, creditors are required to disclose

41

to borrowers certain important information, including: the annual percentage rate, the finance charge, the amount financed, total payments, the payment schedule, and any disclosures or limitations provided in the agreement.  Id. (citing 12 C.F.R. § 226.23).

Plaintiffs aver that Defendants violated TILA "[o]n or after the acquisition of the mortgage . . . [when] monthly rates were increased without explanation, additional and illegal service [were] charge[d], fees or interests were added and no notice was provided to the[m]."  (Compl. ¶¶ 77-80.)  Plaintiffs therefore request the Court to award them money damages and to order the rescission of their loan agreement with Defendants.  Since TILA treats claims for damages and rescission differently, the Court analyzes them separately below.

### 1.   Rescission of the Loan Agreement

When a loan made in a consumer credit transaction is secured by a borrower's principal dwelling, the borrower may rescind the loan agreement under certain circumstances.  Beach, 523 U.S. at 411 (citing 15 U.S.C. § 1635).  Under the statute, the borrower has the automatic right to rescind the loan until midnight of the third business day following consummation of the transaction.  See 15 U.S.C. § 1635(a);[26] 12 C.F.R. § 226.23(a)(3).[27]  A borrower

---

[26] This statutory section states, in pertinent part, as follows:

who exercises this automatic right to rescind is not liable for any finance charge or security interest given by him, and the loan becomes void upon rescission. Beach, 523 U.S. at 412 (citing 15 U.S.C. § 1635(b)). After this three-day period has lapsed, however, the borrower may only rescind the loan within three years of its consummation if he can show that the creditor violated a provision of TILA during the credit transaction. For example, if certain material disclosures are inaccurate or were not provided during the loan transaction, the borrower can rescind the loan up to three years after its consummation. See

---

[I]n the case of any consumer credit transaction . . . in which a security interest . . . is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this subchapter, whichever is later, by notifying the creditor . . . of his intention to do so.

15 U.S.C. § 1635(a).

[27] This statutory section states, in pertinent part, as follows:

The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures, whichever occurs last.

12 C.F.R. § 226.23(a)(3).

15 U.S.C. § 1635(a);[28] 12 C.F.R. § 226.23(a)(3).[29]  The Supreme Court has recognized that "[t]he Act gives a borrower no express permission to assert the right of rescission as an affirmative defense after the expiration of the 3-year period."  Beach, 523 U.S. at 413.

As an initial matter, the evidence of record calls into question Plaintiffs' allegations that Defendants failed to provide them with material disclosures in connection with their mortgage at the time that the transaction was consummated.  More specifically, the promissory note between Plaintiffs and Defendant Aurora Bank — which was secured by the mortgage on Plaintiffs' property serviced by Defendants Bank of America, BAC,

---

[28] This statutory section states, in pertinent part, as follows:

> An obligor's right of rescission shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first, notwithstanding the fact that the information and forms required under this section or any other disclosures required under this part have not been delivered to the obligor[.]

15 U.S.C. § 1635(f).

[29] This statutory section states, in pertinent part, as follows:

> If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first.

12 C.F.R. § 226.23(a)(3).

44

and ReconTrust — clearly and definitively states the principal sum of the loan ($187,267), the percentage rate on the principal (6.00%), the manner of payment, the payment schedule, penalties for defaulting on the note, and the obligations of the parties in connection with the note.  (Defs.' Mot. Dismiss, Bender Cert., Ex. B.)  Similarly, the mortgage security instrument refers to and coincides with the provisions of the promissory note, and further delineates the responsibilities of the parties under the loan agreement.  (Defs.' Mot. Dismiss, Bender Cert., Ex. C.) Both notarized documents bear the signatures of the parties, indicating that they accepted and agreed to the terms and conditions of the loan agreement.  (See Exs. B & C.)  Thus, the record reflects that this information was available to Plaintiffs at the time of the consummation of the loan transaction.  These disclosures are all that is required by the express terms of the TILA statute.  Plaintiffs have not identified in their pleading any specific material information which Defendants failed to provide.  Instead, they argue that, "[i]n this case there were numerous failures to provide meaningful disclosure including the conspiracy to inflate the value of the real estate at the time of the original transaction as well as the false and misleading statements made in conjunction with the real estate transactions[.]"  (Pls.' Resp. Opp'n at 18.)  These allegations, however, do not constitute material information required to be

45

disclosed under TILA.  Moreover, even if the Court were to breathe life into Plaintiffs' claims that Defendants failed to provide them with material disclosures, their claims would still fail.  Assuming — for purposes of the instant discussion only — that Defendants did not provide Plaintiffs with certain material disclosures during the loan transaction, Plaintiffs would have three years within which to file suit seeking rescission of the loan.  See 12 C.F.R. § 226.23(a)(3).  In other words, if Defendants violated a provision of TILA, Plaintiffs had until September of 2009 to seek rescission of their loan agreement under TILA.  Plaintiffs did not, however, attempt to rescind the loan until September of 2012.  As such, Plaintiffs' claims would fail regardless.

In the absence of a statutory violation, the only other way Plaintiffs could rescind their loan under TILA would be within the automatic three-day window provided by the statute.  The parties entered into the loan agreement on September 28, 2006.  Thus, the latest Plaintiffs could have sought to rescind the loan absent a statutory violation was three days after this date.  Plaintiffs did not, however, attempt to do so until they filed the instant action on September 14, 2012 seeking to rescind the loan.  Accordingly, Plaintiffs' attempt to rescind their loan agreement must fail because it is significantly untimely.

Nevertheless, Plaintiff Obringer argues that he is not

46

subject to the above-described timing requirements because the
specific statutory provisions at issue — 15 U.S.C. §§ 1635 and
1640 — only apply to a consumer's "principal dwelling," and,
unlike the Slimms, the property at issue is not his principal
dwelling.  However, even if the property at issue was not
Obringer's principal dwelling and he therefore was not subject to
the above time bars, his argument still cannot stand because
TILA's right of rescission does not apply to "residential
mortgage transactions."  15 U.S.C. § 1635(e)(1)("This section
does not apply to a residential mortgage transaction[.]").  A
"residential mortgage transaction" is defined under the Act as:
"a transaction in which a mortgage, deed of trust, purchase money
security interest arising under an installment sales contract, or
equivalent consensual security interest is created or retained
against the consumer's dwelling to finance the acquisition or
initial construction of such dwelling."  15 U.S.C. § 1602(x).
Noticeably, this definition does not refer to a consumer's
"principal" dwelling, but rather solely references a "dwelling."
A "dwelling," in turn, is defined as "a residential structure or
mobile home which contains one to four family housing units, or
individual units of condominiums or cooperatives."  15 U.S.C. §
1602(w).[30]  In their certifications submitted to the Court,
Plaintiffs have indicated that the Slimms and their children

---

[30]  The statute does not provide a definition for "principal
dwelling."

presently occupy and reside at the property at issue in this dispute.  (See Pls.' Resp. Opp'n, Obringer Cert. ¶¶ 3, 5.)  Thus, the property clearly fits within the definition of a "dwelling" under TILA.  Further, the loan agreement entered into by the parties was a mortgage security instrument retained against the Plaintiffs' dwelling.  Therefore, Plaintiffs' loan agreement constitutes a "residential mortgage transaction" under TILA.  However, a residential mortgage transaction is a transaction expressly exempted from the Act's coverage, and therefore is not rescindable.  See Nix v. Option One Mortg. Corp., No.Civ.A.05-3685, 2006 WL 166451, at *4 (D.N.J. Jan. 19, 2006)(Kugler, J.)("If the transaction is a residential mortgage transaction, then it is not rescindable, and the borrower does not have [] rescission rights[.]").  Accordingly, regardless of whether or not the property at issue was Obringer's principal dwelling, his claims against the Defendants under the TILA for rescission would nonetheless fail.

### 2.  Damages

In addition to the right of rescission, an aggrieved borrower may also seek damages for injuries sustained as a result of a creditor's failure to comply with TILA within one year of the date of the TILA violation.  15 U.S.C. § 1640(a)(1);[31] Cmty.

---

[31] This statutory section states, in full, as follows:

Bank, 418 F.3d at 304.  Subsection (a) of § 1640 provides that:
"any creditor who fails to comply with any requirement imposed
under this part . . . with respect to any person is liable to
such person in an amount equal to the sum of any actual damage
sustained by such person as a result of the failure[.]"  15
U.S.C. § 1640(a)(1).  Similarly, subsection (e) of the statute
provides that: "any action under this section [for a violation of
TILA] may be brought in any United States [D]istrict [C]ourt . .
. within one year from the date of the occurrence of the
violation[.]"  15 U.S.C. § 1640(e).[32]  Our Court of Appeals and
sister courts within this District have previously recognized
that the one-year limitations period begins to run on the date in
which the underlying contract was executed.  See Gray v. Wells
Fargo Home Mortg., No.Civ.A.11-2945, 2012 WL 243750, at *3
(D.N.J. Jan. 24, 2012) (citing Cmty. Bank, 622 F.3d at 303;

_____

        Except as otherwise provided in this section, any
   creditor who fails to comply with any requirement imposed
   under this part . . . is liable to such person in an
   amount equal to the sum of (1) any actual damage
   sustained by such person as a result of the failure[.]

15 U.S.C. § 1640(a)(1).

        [32]  There is an exception to the one-year statute of
limitations provided by § 1640(e).  According to this exception,
a borrower may assert a right to damages after the one-year
period has lapsed if he does so as an affirmative defense of
recoupment or set-off in a collection action brought by the
lender.  See Nix, 2006 WL 166451 at *3 (citing 15 U.S.C. §
1640(e)).  In this case, neither party disputes that the
exception does not apply since Plaintiffs have not brought their
damages claim under TILA as an affirmative defense of recoupment
or set-off.

Bartholomew v. Northampton Nat'l Bank, 584 F.2d 1288, 1296 (3d
Cir. 1978); Blackhall v. Access Grp., No.Civ.A.10-00508, 2010 WL
3810864 (D.N.J. Sept. 22, 2010); Herzog v. IndyMac Bank, FSB,
No.Civ.A.11-4571, 2011 WL 5513205 (D.N.J. Nov. 9, 2011))
(internal parentheticals omitted).

Applying these principles to the instant dispute, assuming
Plaintiffs could show that Defendants violated a provision of
TILA,[33] they had one year within which to file an action seeking
damages under the statute.  This one-year period began to run on
September 28, 2006 — the date on which the loan agreement was
executed.  Thus, Plaintiffs' opportunity to file such a claim
expired one year later on September 28, 2007.  Plaintiffs did
not, however, file an action seeking damages until they filed the
instant Complaint on September 14, 2012 — almost six full years
after they entered into the loan transaction.  Accordingly, their
TILA claim seeking damages is likewise significantly untimely.

Nevertheless, Plaintiffs argue that their damages claim is

---

[33] For the same reasons expressed above in the analysis of
Plaintiffs' claims for rescission, the Court is not convinced
that Plaintiffs have alleged sufficient facts to make out a
plausible claim that Defendants violated TILA.  This finding is
further bolstered by the fact that TILA's statutory language
indicates that a loan modification does not require any
additional material disclosures on the part of the creditors.
See 15 U.S.C. § 1635(e)(2) ("This section does not apply to . . .
a transaction which constitutes a refinancing or consolidation
(with no new advances) of the principal balance then due and any
accrued and unpaid finance charges of an existing extension of
credit by the same creditor secured by an interest in the same
property[.]").

not time-barred because the statute of limitations did not begin to run until Defendants agreed to a modification of their original loan agreement.[34]  As an initial matter, when addressing the promissory estoppel claim, _infra_, the Court found that Plaintiffs had not alleged sufficient facts that Defendants agreed to a final loan modification and that a new agreement therefore arose between the parties.  To the contrary, the Court found that, rather than agreeing to and promising a final loan modification, Defendants merely agreed to permit Plaintiffs to provisionally partake in a TPP.  The finding that the parties did not agree to a final loan modification undermines the central premise of Plaintiffs' present argument that the TILA statute of limitations began to run when the parties entered into a new agreement.  Stated differently, since Plaintiffs have not alleged facts sufficient to show a new agreement, the statute of limitations on Plaintiffs' damages claim could not have started anew.  The Court therefore finds Plaintiffs' argument on this

---

[34]  It is unclear which date Plaintiffs believe would be the applicable start date of the running of the statute of limitations.  On the one hand, Plaintiffs allege in their Complaint that Defendants agreed to modify their loan agreement in December of 2010.  (Compl. ¶ 42.)  On the other hand, however, in their Response in Opposition Plaintiffs assert that Defendants committed to a review of their modification request in May of 2012, and that this agreement to review started the running of the clock.  (Pls.' Resp. Opp'n at 16.)  Regardless of which date would be applicable under Plaintiffs' argument, for the reasons expressed _infra_, the Court rejects Plaintiffs' argument on this point and the applicable date is therefore inconsequential here.

point to be without merit.

Accordingly, for the reasons expressed above, the Court finds that Plaintiffs' claims for both damages and rescission under TILA are untimely.  Moreover, the Court further finds that these claims would fail on the merits even if they were timely. Thus, they shall be dismissed from suit.

### F.   The Racketeer Influenced and Corrupt Organizations Act

Plaintiffs further aver that Defendants violated both the federal and New Jersey Racketeer Influence and Corruption Organizations Acts ("RICO").  Specifically, Plaintiffs argue that Defendants "used income derived from a pattern of racketeering activity to invest in, acquire an interest in[,] or control an enterprise affecting interstate commerce."  (Compl. ¶ 97.) Defendants, in turn, argue that Plaintiffs' RICO claims must be dismissed because they are untimely and fail to allege the requisite predicate acts upon which such causes of action must be based.  Plaintiffs disagree, asserting that their claims are timely and properly pled.

The federal RICO statute, codified at 18 U.S.C. § 1961-68, provides, in relevant part, that:

> It shall be unlawful for any person employed by or
> associated with any enterprise engaged in, or the
> activities of which affect, interstate or foreign
> commerce, to conduct or participate, directly or
> indirectly, in the conduct of such enterprise's affairs
> through a pattern of racketeering activity or collection

52

of unlawful debt.

18 U.S.C. § 1962(c).  In order to adequately plead a violation of the federal RICO statute, a plaintiff must allege: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  Lum v. Bank of Am., 361 F.3d 217, 223 (3d Cir. 2004) (citing Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985)).

Similarly, New Jersey's state RICO statute, codified at N.J.S.A. § 2C:41-2a et seq., provides that:

> It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in or activities of which affect trade or commerce.

N.J.S.A. 2C:41-2.  To sufficiently allege a violation of the New Jersey RICO statute, a plaintiff must prove: (1) the existence of an enterprise; (2) that the enterprise engaged in activities that affected trade or commerce; (3) that the defendant was employed by, or associated with the enterprise; (4) that the defendant participated in the conduct of the affairs of the enterprise; (5) that the defendant participated through a pattern of racketeering activity; and (6) that the plaintiff was injured as a result of the conspiracy.  Ford Motor Co. v. Edgewood Props., Inc., Nos.Civ.A.06-1278 & 06-4266, 2009 WL 150951, at *10 (D.N.J. Jan. 20, 2009) (citing N.J.S.A. 2C:41-2c) (further citations omitted).

It has previously been recognized that, in certain aspects, the New Jersey RICO statute is broader in scope than the federal statute, and that New Jersey courts take a "liberal stance in permitting plaintiffs to plead NJRICO violations, rejecting the narrow construction of the federal statute that many circuits, including this one, have adopted." Edgewood Props., 2009 WL 150951 at * 10 (citing State v. Ball, 661 A.2d 251 (1995)).

### 1.    Timeliness of the RICO Actions

Defendants argue that Plaintiffs' federal and state RICO allegations cannot survive because they were filed after the applicable limitations period.  Plaintiffs, on the other hand, argue that their RICO claims — at least under the state statute — are timely because the NJRICO Act is afforded a more liberal interpretation than its federal counterpart, and therefore provides a longer limitations period.

Although the federal RICO statute does not expressly provide a statute of limitations period for actions brought pursuant to its civil enforcement provision, the Supreme Court of the United States has held that a four-year statute of limitations applies in such instances. Agency Holding Corp. v. Malley-Duff & Assoc., 483 U.S. 143, 146, 156-57 (1987); see also Cnty. of Hudson v. Janiszewski, 520 F.Supp.2d 631, 640 (D.N.J. 2007).  The New Jersey RICO statute also does not explicitly provide a statute of limitations period for NJRICO claims, but courts within the state

54

have likewise adopted a four-year statute of limitations for such claims.  Id. (citing In re Liquid. of Integrity Ins. Co., 245 N.J. Super. 133, 137 (N.J. Super. 1990)).  The Third Circuit has recognized that the four-year limitations period begins to run when the plaintiffs knew or should have known of their injury and the source of their injury.  Forbes v. Eagleson, 228 F.3d 471, 484-85 (3d Cir. 2000); Mathews v. Kidder Peabody & Co., 260 F.3d 239, 252 (3d Cir. 2001); Prudential Ins. Co. of Am. v. U.S. Gypsum Co., 359 F.3d 226, 233 (3d Cir. 2004).  In the instant case, Plaintiffs' Complaint was filed on September 14, 2012.  Thus, to be timely, Plaintiffs had to know or should have known of their alleged injury and the source of the injury no earlier September 14, 2008.  If they knew or should have known of their injuries before this date, then their claims are untimely.

In the Complaint, Plaintiffs allege that they were financially and emotionally injured as a result of Defendants' initiation of foreclosure proceedings and failure to accommodate their loan modification request.  Defendants initiated the foreclosure proceedings on March 10, 2010.  The Slimms first contacted Defendants to request a loan modification in May of 2010, and Defendants apparently agreed to modify the loan in December of 2010.  Plaintiffs thereafter began to participate in a provisional TPP program in January of 2011.  On February 3, 2012, Defendants denied Plaintiffs' request for a final loan

modification.  All of these relevant actions took place within
the four-year statute of limitations period.  More specifically,
when Defendants initiated foreclosure proceedings and denied
Plaintiffs' request for a loan modification, Plaintiffs knew (or
at the least, should have known) that they may suffer financial
and emotional injuries as a result.  Accordingly, Plaintiffs RICO
claim is timely.[35]

---

[35] In their Response in Opposition, Plaintiffs argue that
their NJRICO claim is timely because the state statute is
afforded a more liberal interpretation than its federal
counterpart.  Having already determined that all the relevant
conduct occurred within the four year statute of limitations
period adopted by both the federal and state RICO statutes,
Plaintiffs' NJRICO claims are timely.
    In any event, the Court notes that the Third Circuit
previously considered and rejected this exact argument in Cetel
v. Kirwan Financial Group, Inc., 460 F.3d 494, 510 (3d Cir.
2006).  In that case, the plaintiffs argued that the New Jersey
Supreme Court's decision in State v. Ball, 141 N.J. 142 (N.J.
Super. 1995) stood for the proposition that NJRICO should not be
interpreted coextensively with the federal RICO statute, and that
the limitations period under the state statute was therefore
longer.  Id. at 509-10.  The Third Circuit disagreed, stating
that:

> A close reading of Ball suggests, contrary to plaintiffs'
> contention, that the New Jersey Supreme Court believed
> the New Jersey RICO statute was and should be consistent
> with the federal RICO statute. . . . [N]othing in Ball,
> or any other case, stands for the proposition that claims
> under the New Jersey RICO statute possess a six-year
> statute of limitations, as opposed to the commonly
> applied four-year limitations period for federal RICO
> claims.  There is no evidence that the New Jersey RICO
> statute possesses a different statute of limitations from
> the federal RICO statute and we refuse to adopt such a
> rule.

Id.  When applying the holding of Cetel to the instant case, it
is clear that Plaintiffs' argument on this point cannot stand.

**2.   The Pattern of Racketeering Activity and Presence of Predicate Acts**

Having established that Plaintiffs' RICO claims are timely, the Court must next consider whether Plaintiffs have sufficiently pled the existence of a RICO violation.  As indicated above, both the federal and state RICO statutes require plaintiffs to show that the defendants engaged in a "pattern of racketeering activity."

To sufficiently make out a pattern of racketeering activity under the federal RICO statute, a plaintiff must allege at least two predicate acts of racketeering that occurred within ten years of each other.  Lum, 361 F.3d at 223 (citing 18 U.S.C. § 1961(5)); Korean Cmty. Church of N.J. Methodist v. Cho, No.Civ.A.11-4333, 2012 WL 1224682, at *3 (D.N.J. Apr. 11, 2012) (citing 18 U.S.C. §§ 1964, 1961(5)).  Section 1961(1) delineates the predicate acts that constitute racketeering activity for RICO purposes.[36]  Our Court of Appeals has recognized that this

_____

However, since both Plaintiffs' federal and state RICO claims fall within the four-year statute of limitations period, the Court merely mentions this point as an aside.

[36] The full list of predicate acts provided by § 1961(1) includes the following:

"Racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical . . . , (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201

(relating to bribery), section 224 (relating to sports bribery), sections 471, 472, and 473 (relating to counterfeiting), section 659 (relating to theft from interstate shipment) if the act indictable under section 659 is felonious, section 664 (relating to embezzlement from pension and welfare funds), sections 891-894 (relating to extortionate credit transactions), section 1028 (relating to fraud and related activity in connection with identification documents), section 1029 (relating to fraud and related activity in connection with access devices), section 1084 (relating to the transmission of gambling information), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud), section 1425 (relating to the procurement of citizenship or nationalization unlawfully), section 1426 (relating to the reproduction of naturalization or citizenship papers), section 1427 (relating to the sale of naturalization or citizenship papers), sections 1461-1465 (relating to obscene matter), section 1503 (relating to obstruction of justice), section 1510 (relating to obstruction of criminal investigations), section 1511 (relating to the obstruction of State or local law enforcement), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant), section 1542 (relating to false statement in application and use of passport), section 1543 (relating to forgery or false use of passport), section 1544 (relating to misuse of passport), section 1546 (relating to fraud and misuse of visas, permits, and other documents), sections 1581-1592 (relating to peonage, slavery, and trafficking in persons)., [FN1] section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), section 1953 (relating to interstate transportation of wagering paraphernalia), section 1954 (relating to unlawful welfare fund payments), section 1955 (relating to the prohibition of illegal gambling businesses), section 1956 (relating to the laundering of monetary instruments), section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), section 1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire), section 1960 (relating to illegal money transmitters), sections 2251, 2251A, 2252, and 2260 (relating to sexual exploitation of children), sections

provision "catalogues an exhaustive list of 'racketeering activities' [which] RICO encompasses" and that "[t]o read it otherwise would be to usurp the role of Congress in drafting

---

2312 and 2313 (relating to interstate transportation of stolen motor vehicles), sections 2314 and 2315 (relating to interstate transportation of stolen property), section 2318 (relating to trafficking in counterfeit labels for phonorecords, computer programs or computer program documentation or packaging and copies of motion pictures or other audiovisual works), section 2319 (relating to criminal infringement of a copyright), section 2319A (relating to unauthorized fixation of and trafficking in sound recordings and music videos of live musical performances), section 2320 (relating to trafficking in goods or services bearing counterfeit marks), section 2321 (relating to trafficking in certain motor vehicles or motor vehicle parts), sections 2341-2346 (relating to trafficking in contraband cigarettes), sections 2421-24 (relating to white slave traffic), sections 175-178 (relating to biological weapons), sections 229-229F (relating to chemical weapons), section 831 (relating to nuclear materials), (C) any act which is indictable under title 29, United States Code, section 186 (dealing with restrictions on payments and loans to labor organizations) or section 501(c) (relating to embezzlement from union funds), (D) any offense involving fraud connected with a case under title 11 [], fraud in the sale of securities, or the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical . . . ; (E) any act which is indictable under the Currency and Foreign Transactions Reporting Act, (F) any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens), section 277 (relating to aiding or assisting certain aliens to enter the United States), or section 278 (relating to importation of alien for immoral purpose) if the act indictable under such section of such Act was committed for the purpose of financial gain, or (G) any act that is indictable under any provision listed in section 2332b(g)(5)(B)[.]

18 U.S.C. § 1961(1).

statutes." <u>Annulli v. Panikkar</u>, 200 F.3d 189, 200 (3d. Cir. 1999), <u>overruled on other grounds by</u> <u>Rotella v. Wood</u>, 528 U.S. 549 (2000).  Further, it is well-known that the heightened pleading standards of Federal Civil Rule 9(b) apply to claims predicated upon the RICO statute.  <u>Rose v. Bartle</u>, 871 F.2d 331, 356 n.33 (3d Cir. 1989).

Similarly, under the New Jersey statute, a "pattern of racketeering activity" requires (1) engaging in at least two incidents of racketeering conduct, the last of which occurred within ten years after a prior incident of racketeering activity; and (2) a showing that the incidents of racketeering activity embrace criminal conduct that has either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents.  <u>Desmond v. Siegel</u>, No.Civ.A.10-5562, 2012 WL 3228681, at *9 (D.N.J. Aug. 6, 2012) (citing N.J.S.A. 2C:41-1d).  Under the New Jersey RICO statute, incidents of racketeering activity are the same as those provided by the federal statute in § 1961(1).  <u>See</u> N.J.S.A. 2c:41-1(a); <u>Edgewood Props.</u>, 2009 WL 150951 at *15 (noting that NJRICO incorporates by reference the federal list of racketeering activities.)  Unlike the federal statute, however, NJRICO does not place as much emphasis on "continuity," but rather focuses on the "relatedness" of the conduct.  <u>See</u> <u>State v. Ball</u>, 141 N.J.

142, 166–69 (N.J. 1995).  More specifically, "to be covered, [the activity] must encompass incidents of criminal conduct that are not disconnected or isolated. . . . [and] must exhibit some temporal connection or continuity over time."  <u>Id.</u> at 169.

In the instant case, Plaintiffs generally aver that Defendants engaged in a pattern of racketeering activity by improperly filing court documents, robo-signing documents, making false and misleading statements to state and federal agencies, and failing to comply with guidelines provided by the OCC, FTC, and Consumer Financial Protection Bureau ("CFPB").  First, in making this claim, it appears as though Plaintiffs once again refer to the February 2012 settlement that Bank of America entered into with the OCC regarding certain servicing and foreclosure practices at the company.  As has been repeatedly recognized throughout this Memorandum Opinion, Plaintiffs lack standing to sue on account of this settlement as they are not parties to its terms and were in no way involved in that litigation.

However, at this stage of the proceedings, the Court is required to view the Complaint in the light most favorable to Plaintiffs.  Therefore, assuming Plaintiffs' RICO claims are not based upon the 2012 Bank of America—OCC settlement, in order to survive dismissal, they must be premised upon at least two of the predicate acts enumerated in § 1961(1).  The basis of Plaintiffs'

RICO claims is that Defendants improperly filed and robo-signed documents, made false or misleading statements, and violated guidelines promulgated by certain government agencies. Affording these allegations a liberal interpretation, the only possible conduct listed in § 1961(1) within which Plaintiffs' allegations could fall would be the mail and wire fraud statutes.

Improper use of the federal mail and wires is a predicate offense under both the federal and New Jersey RICO statutes. See Edgewood Props., 2009 WL 150951 at *15. The crimes of mail and wire fraud prohibit the use of the mail or interstate wires for purposes of carrying out a scheme or artifice to defraud. The elements of mail and wire fraud are: (1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of the mails or interstate wire communications in furtherance of the scheme. United States v. Hedaithy, 392 F.3d 580, 590 (3d Cir. 2004) (quoting United States v. Antico, 275 F.3d 245, 261 (3d Cir. 2001)).[37] The Third Circuit has previously recognized that "[a] scheme or artifice to defraud need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentation or

---

[37] The mail fraud and wire fraud statutes are "in pari materia and are, therefore, to be given similar construction" and are commonly jointly interpreted. United States v. Fumo, Crim.No.06-319, 2008 WL 1731911, at *2 (E.D. Pa. Apr. 10, 2008) (internal citations omitted).

omission reasonably calculated to deceive persons of ordinary prudence and comprehension." Lum, 361 F.3d at 223 (internal citation & quotation marks omitted).

The Third Circuit has likewise recognized, however, that allegations of mail and wire fraud utilized as a basis for RICO violations must comply with Federal Rule of Civil Procedure 9(b). Id.; see also Desmond, 2012 WL 3228681 at *10 ("Where a plaintiff relies on mail and wire fraud as a basis for a RICO violation, the allegations of fraud must comply with Federal Rule of Civil Procedure 9(b), which requires that allegations of fraud be pled with specificity.") (internal citation & alteration of text omitted). As has been discussed above, Rule 9(b) requires that "a party [] state with particularity the circumstances constituting fraud" in its claim. Fed. R. Civ. P. 9(b). The requirements of the Rule may be satisfied by alleging "the date, time and place" of the purported conduct, or through alternative means that "otherwise inject precision or some measure of substantiation" into the claim. Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007)(citing Lum, 361 F.3d at 224). Furthermore, "Plaintiffs also must allege who made a misrepresentation to whom and the general content of the misrepresentation." Id. (internal citation omitted)

Here, Plaintiffs have not indicated when, where, or how Defendants utilized the mails or interstate wires for the purpose

63

of carrying out a fraudulent scheme, nor have they otherwise pled any specific factual allegations to substantiate their RICO claims.  Plaintiffs likewise have not established the presence of a fraudulent scheme, the participants of such a scheme, or how the mails and interstate wires were utilized to execute the scheme.  To the contrary, Plaintiffs merely baldly assert that "Defendants" (they do not specify which Defendants) improperly filed unknown documents before unnamed courts, fraudulently signed and filed documents whose contents are unknown, and violated unidentified guidelines of certain government agencies. These conclusory statements do not substantiate a finding that Defendants knowingly and willfully used the mail and wires in furtherance of a fraudulent scheme.  As such, Plaintiffs have not satisfactorily pled — as is required by both the federal and state RICO statutes — the presence of two predicate acts of racketeering activity.  Without these requisite predicate acts, Plaintiffs' RICO claims cannot succeed.  Cho, 2012 WL 1224682 at *3 (citing Annulli, 200 F.3d at 200; Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737, 747 (3d Cir. 1996))("Failure to plead a pattern of predicate acts is fatal to a RICO claim."). Thus, since Plaintiffs cannot satisfy the threshold requirements of RICO, their claims as presently pled are insufficient to survive dismissal.[38]

---

[38]  Given that Plaintiffs have not sufficiently alleged the presence of the requisite predicate acts upon which their RICO

**G.   Plaintiffs' Final Cause of Action**

The final count of Plaintiffs' Complaint is a summation of all their previous counts, and does not include any new allegations against Defendants.  Defendants move to dismiss this count on the grounds that it is duplicative and confusing.  In their Response to Defendants' Motion to Dismiss, Plaintiffs do not appear to oppose this action, instead admitting that, "in their Seventh Cause of Action[,] [Plaintiffs] merely incorporate the previous paragraphs and counts and plead that all of the defendants are liable not just individually, but jointly, severally, and in the alternative."  (Pls.' Resp. Opp'n at 25.)

It is well-recognized that a court may dismiss a duplicative claim in a complaint.  See Mackachinis v. McCosar Minerals, Inc., No.Civ.A.12-2013, 2013 WL 1752472, at *3 n.1 (M.D. Pa. Apr. 23, 2013) (citing Brown & Brown, Inc. v. Cola, 745 F.Supp.2d 588, 626-27 (E.D. Pa. 2010); Caudill Seed & Warehouse Co., Inc. v. Prophet 21, Inc., 123 F.Supp.2d 826, 834 (E.D. Pa. 2000)).  Therefore, the Court finds that Plaintiffs' seventh count is duplicative of the previous counts in their pleading, and, as such, it will be dismissed with prejudice from suit.

---

claims could be based, the Court need not consider whether Plaintiffs have sufficiently shown that an enterprise exists. See Cho, 2012 WL 1224682 at *4.

**V.   CONCLUSION**

For the reasons set forth above, Defendants' Motion to Dismiss will be granted.  The Court recognizes the Plaintiffs' difficult situation and is mindful of the plight of many homeowners in these troubled economic times, but it must dismiss their Complaint with respect to Defendants Bank of America, BAC, ReconTrust, Countrywide, and MERS for failure to state a claim upon which relief can be granted.  However, given that the remaining Defendants in this action have not moved to dismiss Plaintiffs' Complaint or otherwise taken any action as to Plaintiffs' allegations, the action against them shall remain.[39]


An appropriate Order will follow.


                                        _/s/ Noel L. Hillman_
At Camden, New Jersey                   NOEL L. HILLMAN, U.S.D.J.

Dated:   _05/02/2013_____

---

[39]   The non-moving Defendants are: Freddie Mac, Aurora Bank, CGW Realty, and Denise Toft.

66